Good morning, ladies and gentlemen. We have one case on the calendar this morning. Case of Brown v. Lampert. Counsel? I'm Gilbert Levy. I and my co-counsel, Suzanne Elliott, represent the petitioner, Cal Brown. We would like to divide our argument in the following way. I'd like to spend 15 minutes talking, in opening, talking about the ineffective assistance issue. Ms. Elliott would like to spend five minutes talking about the juror issue, and we would rely on the briefs for the statutory argument. In this case, this is simply about a failure to do the obvious and a failure to investigate. Petitioner's trial counsel called a psychologist who was the primary defense expert for the mental illness issue, who was allowed to testify beyond the scope of his expertise. They then failed to investigate and call a psychiatrist when the nature of the mental defense that they were presenting required the testimony of a psychiatrist. And the net effect of this failure was to completely demolish the defense. Not only were they able to unsupport claims that they made to the jury in opening statement, but because of the lack of qualifications on the part of their primary expert, coupled with the state's calling of a properly qualified expert, was not only to completely fail to support the issue that Mr. Brown should have been on medication and could have been on medication, but it also had the effect of undermining the testimony of their primary expert when he talked about the existence of a mental condition, which contributed to the condition of the crime. Could you tell me exactly what your theory is about why the lithium mattered? This may sound naive, but he was on lithium when he was released in Oregon. I gather that he stopped taking it, but he also absconded from parole altogether. So how would anything Oregon had done differently with regard to the lithium, which is really what it amounts to, have made a difference? Well, I think as Dr. Sher testified in the federal evidentiary hearing, people who have this kind of condition will not ordinarily not take the medication on their own. They like the feeling of being manic, and so they go off their medication. And so in order to treat them properly, you have to monitor the medication. I can't hear you. In order to treat them properly, you have to monitor the medication. You have to do blood draws. And simply giving the person a bottle of lithium and saying, here, take it, is inadequate treatment, given the nature of the mental condition that these people suffer from. As to why it mattered, I think there were basically two prongs to their mental defense. One was that he had a mental disorder, and the other part of it was that he had a treatable mental disorder for which he did not receive proper treatment, and that was a significant factor in contributing to the commission of the crime. They called a psychiatrist who could talk about the mental disorder, but he was not properly qualified. I understand that, but the gap that I'm having a little difficulty with is that all of this assumes that he would have remained under supervision, but he didn't. He left. My recollection of the record is that he took lithium for a period of time after he was released from Oregon State Prison, so that at that point he was willing to follow through with the conditions of his parole. He said he wasn't. Had those conditions include closer supervision of the medication and closer supervision of the ingestion of medication, there's reason to believe that he would have followed through, but since he had this disease and he wasn't treated properly, he didn't follow through. So the reason that he didn't follow through is not necessarily that he was a bad person or that he was an irresponsible person, but that he had a disease that would make it likely that he wouldn't follow through unless he was more closely supervised, and that's my understanding of the testimony of Dr. Scherer in the federal evidentiary hearing. The also is your argument only to only go to lithium argument, only go to who's responsible for this or culpability for the crime, or does it go to future dangerousness also as a separate argument? I think it goes to future dangerousness in the sense that here's a man that may have some predisposition to commit illegal acts, but with treatment there's a heightened ability to control his behavior, and so therefore he would be less dangerous, as I believe Dr. Scherer... There wasn't a trial, this wasn't said in the evidentiary hearing as a reason for not doing this, but it was evident in the trial itself that a decision was made to stay as far away from future dangerousness as possible, because the, and it was a proffer of, by the prosecution of what evidence they would have put on had there been a discussion of future dangerousness. So it appeared to me from reading the trial transcript, it wasn't mentioned in the evidentiary hearing, that there, that future dangerousness was something that the trial team had made a strategic decision not to get into. Well, I don't know that there was argument about this, Your Honor, but on the other hand, I think it might... There was extensive argument about it. The conduct that was presented to the jury in the guilt phase certainly would raise the issue whether there was specific argument by defense counsel or not. Well, I'm telling you that there was specific, that there was a proffer of very specific evidence, which I'm sure you're aware of, by the government as to what it would have put on if future evidence, in a several-page proffer regarding evidence that supposedly demonstrated possible escape plans and other things and a discussion in which the defense counsel said that they had, and the judge ruled, that you had not opened up or the trial team had not opened up future dangerousness sufficiently, so none of this came in. But obviously, if you had opened up future dangerousness, it may well have come in. Okay, I understand the court's point, and it seems to me, with all due respect, that calling a psychiatrist who is qualified to talk about lithium would not have opened the door any more than calling a psychologist, as they did, who is not qualified to talk about lithium, so that, in this case, not calling a psychiatrist... Well, I don't think that was the question. I asked whether the use of the lithium supported an argument against future dangerousness, and Judge Berzheim was asking you whether future dangerousness was eliminated from the case, although it's a statutory factor. I'm not quite sure how it could have been... Not eliminated, but that there was a decision made not to discuss it. Well, I can understand how the specific discussion of future dangerousness might have created the problems that Judge Berzheim is adverting to, but I just don't understand if they called the psychiatrist to testify to what the psychologist tried to testify to, that that would have created any... No, all it means is that you couldn't have made any more of an affirmative argument than you did before. That's all it means. I agree. Just briefly, and I don't want to use up all my time, I think the Rumpella case is important. The recent Supreme Court Rumpella case is important because it suggests, again, that putting on some mitigation is not enough. Here, there's not a... You can't call it a tactical decision if it's based upon failure to investigate, and here, clearly, there was no failure to... There was a complete failure to investigate. Also, there's no testimony in the record by any of the defense attorneys that this was a tactical decision. Mental health is extremely important. Mental health issue in Washington is an extremely important part of defense mitigation in a capital case because it's a statutory mitigating factor. In Washington, because the standards for getting a death sentence are so high, we maintain that there's a very low threshold for showing prejudice. It's a single jury standard. If there's a reasonable possibility that a single juror would have voted for life, that's a sufficient showing of prejudice. And lastly, the failure to call the psychiatric social worker in Washington, who was most familiar with Mr. Brown and who was not an expert, who was hired by the defense, who could talk about strenuous, unsuccessful efforts to secure medication for him while he was in Oregon, was an extremely important failure and additional strong evidence of failure to investigate. And not cross-examining the state psychiatrist, we maintain, was not a reasonable tactical decision because they had absolutely no idea what he was going to say and made no effort to learn that before he testified. With that, I'd like to reserve the rest of my time. Thank you, sir. Good morning, members of the panel. I'm Suzanne Elliott, and I am here to talk briefly about our arguments under the trio of U.S. Supreme Court cases in Witherspoon, Witt, and Adams. Our argument is that the Washington State Supreme Court unreasonably applied the standard of Witt, Witherspoon, and Adams when it approved the trial judge's recusal of three jurors who, under the record developed here, were not substantially impaired as jurors in a capital case. We know that the Supreme Court has said substantially impaired means an inability to apply the facts or the law of the case or an inability to follow their oath as jurors. Witt says that's a factual question. That's correct. And that it must have been that determination that when the district or the trial court rather grants a strike for cause, it is a finding of bias. It's a finding that the juror could, even if the judge doesn't say so explicitly, it is a finding that the judge, it's evidence of a finding that the judge has determined that the juror cannot, that the juror's view of the death penalty will impair his ability to pass on the facts of the case impartially. That's correct. And it goes further to say the death penalty. And that we owe deference. That's a finding out of 2254 as to which we owe state courts deference. And now I guess under Ed Power, presumption of correctness, and it gets swaddled in even more deference. So that's the case you have to make, is that in a post-Ed Power world, that that is an incorrect factual finding. That's correct, Your Honor. I know that I have a very heavy burden here, but the Supreme Court has never said there isn't some limit to the deference that should be afforded. Let me just add one more layer. And as to one of those three, there was no objection at all. So you have, you might have a procedural bar there in addition to everything else. You might have had a procedural bar. No one has raised a procedural bar to juror deal. I will note, however, that I agree that in the Witherspoon, maybe it was Witt, case, the Supreme Court said that is a factor that goes into this evaluation of the trial judge's deference. And if trial counsel hasn't objected, that's something that the Federal courts can consider. It seems to me in this instance to cut in your favor, actually. It seemed fairly obvious that the reason they didn't object was because they thought this person was more likely to favor them than otherwise. Well, no one had made that argument, and that question wasn't asked. And the question was not asked of trial counsel at the time of the evidentiary hearing. Well, was there some other reason why you didn't raise an objection to juror Dennis? Well, let's go back to Judge Kuczynski's question of what standard we're applying. So this is a factual finding, and this comes under the first part. It's not dressed in this presumption of correctness that Taylor speaks about until after it gets through the first stage. And we're at the first stage where you have to make a finding that it's an unreasonable factual finding and objectively unreasonable determination of the facts. So it's your assertion that it is with respect to each of these three jurors based on the evidentiary record before it, before us. It is an unreasonable determination of the facts. Yes. And in particular, if you get through that stage, then it's then you get through that and you want to counter it with external evidence. Then we have another. Then you approach it with the dressed in the presumption, whatever it is, sealed in with something dressed in all those fancy words from Taylor. But your claim is the first one that it is just based on the evidentiary record before us. So it is with respect to each of those jurors, a determination with respect to each of those jurors that he was impaired is an objectively unreasonable determination, giving all the deference to the state court that we must give. That's correct. And in particular, I'd like to talk about Juror Henderson, where the record is. I'm sorry, before you get to answer, let me just put a point on how to use the word each, but that you have to prove this to each. In fact, you know, I didn't say you have to. I said her position is with respect to each. You only have to establish any. We challenge three, but anyone will do. Anyone will do. Just on the same page. OK. So that's why I would like to, in the time that I have remaining, talk about Juror Henderson, who was an attorney. And she clearly. Are you going to demonstrate for us what she did so that we can tell how the judge made a decision based on what he observed of her squirming in her chair and putting up her hands? She stated I particularly would like to know how she crossed her arms and raised her hand at the same time. And she was demonstrating. My reading of the record is she's demonstrating how she would communicate that she couldn't follow the law when in fact she was telling the court that I can follow the law. I'm a lawyer. She says I know how important it is for a juror to follow their oath. And she felt at the E.R. 15 that she had an extra obligation to follow the law as a lawyer. But she also said that she felt resentment of being put in that position. She said it twice. And she said, I believe she said twice. I think once she said it and once she agreed when counsel asked her the question, that she thought this was brutish and that the best president today is brute of us all, suggesting that in order for her to do that, she'd have to be a brute at least. Well, she was halfway there. She was a lawyer. Well, I'm not going to agree with that, Your Honor. It is true that she had held strong feelings about the death penalty, but she never said she couldn't put those aside. In fact, she felt she had a higher duty to follow. But she did not say that she wouldn't resent it. She did say that she would resent it. And if I read Adams and Witt, what we're told there, or Adams in light of Witt, you know, Witt sort of puts a gloss on Adams. What Justice Rehnquist said there was the question is impairment. Is whatever feelings a juror has enough to impair his ability? And why isn't her statement, which she never attacked, that she would feel resentful of the whole process, twice she said this, why is that enough? Her feelings are strong enough to make her feel resentment about being put in a position. Because Adams also says that the feeling that it would be difficult or burdensome to make this incredible kind of decision, the kind of decision we rarely ask or never ask in any other situation for citizens to make, is enough. And I read her saying, finding enough resentment to be similar to that of the juror in Adams who said, you know, it's going to be difficult. It's going to be burdensome. And there the Supreme Court said, you know, what juror wouldn't respond in that way when presented with the duties that they're going to have to undertake in a capital case? And coupled with her other statements in this case, and nowhere does she say, as the juror at Witt said, I just couldn't do it. So I, under those, and then the judge simply says her impairment was obvious, which is not true, from her statements under oath as a juror to the court. So, in particular, in Juror Henderson's case, the judge was unreasonable in his facts finding, the trial judge. Ms. Dennis, who was also affected too, similarly was affirmative in her statements that she could put aside her feelings, follow the law. Dennis is a harder case for you, I thought. I think you were right to go to Henderson. I think that was your best case. I don't think that's your best case. I want a grander deal. Doesn't Wainwright v. Witt establish that the lack of objection doesn't matter when it's here, the State Supreme Court addressed it? As a procedural bar, absolutely. So if you take off that problem, why isn't Mr. Geale much more obvious? He was far less equivocal, I would agree, than Dennis, although I do believe in a footnote. To be fair, Justice Rehnquist says that's a factor that the court can consider, although none of the lower courts, I'd say, is actually a factor running in the other direction in this case. And he clearly was unequivocal that the death penalty was proper in some cases. He was able to follow the reasonable death standard. Is there any case that's approved the exclusion for death penalty reasons of a juror who favors the death penalty? Not that I know of. And he also indicated that he would impose death even if there was the life without the possibility of parole on the table. So he seemed to understand clearly his duty and never equivocated or was ambiguous in his responses. I would agree Ms. Dennis made one ambiguous response. There's an exchange that starts on page 92 of the transcript and is interrupted by an objection. But the question is, do you think in your heart of hearts you could actually, in a case like this, ever merely vote to impose a death penalty? And there are a series of objections that start at line 18 of page 92 and continue until page 12 of the following page. But then comes the answer. And I realize these objections, to some extent, may weaken the answer a little bit. But the next thing she says is, I don't think I could. I would have to be so crystal clear. I would have to be. So she's asked the question. There's sort of an exchange. And what the answer she actually gives is no, she doesn't think she could. And I realize it could be read differently, but it could be read that way. And we get a difference in the talk with. And that's the way the state reads it. And my understanding of her answers, and I think the deferential reading would be that she would have difficulty if the standard of the burden of proof was not met. But I agree. She says at one point, I couldn't, during that series of exchanges. Elsewhere in her testimony, however, she states she affirms she could follow the instructions at ER 63. She says she could put her emotions aside. And she also agreed that she'd struggled with the issue and that some crimes deserve the death penalty. So if you isolate out that one short phrase, the state is usually one to talk about Obama. Yes. She indicated it was. She had considered that and had considered the moral issue and struggled with it and talked to your co-counsel. Initially, he said he was going to save about 10 minutes for a rebuttal. You're down to six. So I just want to advise you because you're looking a little nervous. Well, I will answer whatever. I've been known to be very generous this time. Well, I will. If you have something to say that's helpful on this point, I think we'd like to hear it. The helpful point as to Juror Dennis is that that one short phrase out of a lengthy colloquy answers to a questionnaire and answers to the judge, in all of which she affirmed she was not impaired under the test that's set forth by the United States Supreme Court, meaning that she had considered the facts and the law and she could follow her oath as a juror. She, again, follows, I think — I don't mean to argue with you at all. I think that perhaps any of us, three of us sitting in that case as trial judges, might have seen it that way. But I think we are required under AETPA and so many levels removed from that particular trial to ask, can a reasonable jurist in that position, having looked at the same exchange, have come to the opposite conclusion? I find the difficulties, as to Dennis at least. Well, and I understand. I understand it's difficult to call a trial judge unreasonable. Oh, I don't know. I do it all the time. Okay. Since you've ranked your three clients, I assume you're going to put Dennis third, is that right? I would put Dennis — I would rank them as the Henderson deal and Dennis, and that's exactly the way that I have them on my discussion sheet. Well, you got two of them right. Okay. Thank you, Your Honor. I'll reserve whatever time Mr. Levy and I have for rebuttal for Mr. Levy. Thank you. Thank you. Thank you, Your Honors. May it please the Court, I'm John Sampson, assistant attorney general representing the respondent. I will address the last — the issue that was just discussed first and then move to the ineffective assistance. Actually, I wanted to ask a question about the other issue, the unargued issue, because it really relates to two of the three issues. And that's the question in part relating to future danger. The statute tells the jury, having in mind the crime of which the defendant has been found guilty, are you convinced beyond reasonable doubt that there are not sufficient mitigating circumstances to merit leniency? That's what the jury is supposed to determine. Having in mind the crime, are there not sufficient mitigating circumstances? But then the statute provides the admission of evidence of the past criminal record and future danger. One, preliminarily, was future dangerousness a factor for the jury to consider in this case? And secondly, how does the jury understand what to do about future dangerous and criminal record? How are those things relevant to the question they are asked? It's relevant, Your Honor, because future dangerousness goes to the character of the defendant and to the circumstances of the crime. The — Well, it doesn't go to the circumstances of the crime. It precisely does not. It goes to the future. It does, Your Honor. But to some extent, it goes to the circumstances of the crime because the juror realizes — the jury realized this was a dangerous man. This was a man who raped and tortured an innocent young woman for one reason, and that reason is because he enjoyed doing it. But you know that — you know that from the nature of the crime, not from the future dangerousness. Your Honor is correct, but the issue of future dangerousness is a permissible issue the jury may consider. But it's so odd about this. I mean, I find this statute very odd, and the reliance on TLAFAR, as that's the name of the case, a little odd, too, because in the cases on which you're relying, the jury was told that they could take everything into account. Here, they were precisely not told that. They were told that they could consider two things, the crime and mitigating circumstances. Your Honor, they were specifically instructed that the jury can consider all of the evidence presented in both the guilt phase — Yes, as relevant, but it has to be relevant to what? Relevant to the question they were deciding. So the question they were deciding was the question that was put to them, having in mind the crime and its nature. Are there — has it been shown beyond a reasonable doubt that there's no mitigating circumstances? So how does any of the — how is any of the either future dangerousness or even the prior crimes, which I understand is in the statute, but not communicated at all to the jury as to what they're supposed to do with it? And the Supreme Court has never required that type of an instruction. But they've never had a statute like this. The question is, does the statute make any sense? Is what the jury told unclear, contradictory, and vague? If you're told, here is what you should consider, consider — suppose they said it even more clearly. They said you can only consider two things, consider the crime and consider the mitigating circumstances. And then you said to them, now, here is evidence, future dangerousness, past criminal activity. I believe Your Honors are looking at one instruction in isolation. No, it's not an instruction. It's a question that the statute says the jury must determine. And that is — That's what the verdict is to be. The verdict is to be having in mind the crime of which the defendant has been found guilty. Are there mitigating circumstances, or are there not? And the jury — I'm sorry, Your Honor. Yeah. And that seems to be inconsistent with them giving them evidence of other things that don't go to either the crime or the mitigating circumstances. It's not inconsistent because the jury was also instructed that in reaching this decision they could consider all of the evidence that was submitted in both the guilt and — That doesn't make — I'm sorry, but it's not a satisfactory answer because they can consider all the relevant evidence. So relevant to what? Relevant to what? They were asked. I mean, there's always — you can always consider — isn't the standard — the instruction that you can consider all the evidence a standard instruction? That's not just for this purpose. You can always consider all the evidence that's relevant to what you're deciding. It's a proper instruction under the United States Supreme Court case law. I'm saying outside of the death penalty. Always the jury can consider all the evidence. But what can we consider it as to? As to whatever the question is that it's being asked? Yeah, that's correct, Your Honor. Okay. And this is relevant. How is it relevant? That's what I'm trying to understand. It's relevant because it goes to the circumstances of the crime or the character of the defendant. And those are both proper factors under both state law and — Character of the defendant meaning — I mean, the one thing that I've been able to think of that might be an explanation is that maybe it's sort of harmless in this instance because — or at least the criminal past is harmless because it's essentially rebuttal, although out of order, of the mitigating circumstances, maybe. Other than that, I can't see its relevance. Your Honor, a character of a defendant includes its prior conviction. It includes its criminal history. But where is character of defendant in here? I'm sorry, Your Honor? Where is character of defendant in this question as a mitigating circumstance? The state is not required under United States Supreme Court case law to specifically instruct the jury. I understand that. But this is a statute that's not similar to any statute as far as I can tell in that it doesn't tell the jury that they can — that they could have said, you can consider everything and you decide, you know, what matters and you make the decision. That's what the case law is. But that isn't what Washington has chosen to do. If the statute is not like anything the Supreme Court has considered, relief is barred because the Supreme Court has not ruled on this issue. No, no, no, no, no. That's going a little far. The — no, the Supreme Court could have principles of law that apply, such as things can't be so vague that a jury can't follow them. It doesn't mean it has to consider the same fact situation before. But I don't want to take all your time on this. Let me go back to the other part of the question, which is, was future dangerousness a factor before the jury? I believe, Your Honors, that as Judge Berzon pointed out, there was a discussion in the court held that the defense had not really opened the door to — Well, why do you have to open the door? Doesn't the statute provide that that's a factor? It is, but it was not presented in the state's case in chief, and it was not presented future dangerousness as an individual issue. And they have not — petitioners have not raised that challenge. The challenge really is to the evidence of the prior conviction. That is the only challenge presented to the district court. Okay. I understand it can be the — and it can also be on the record in the trial. I'm just asking whether that was something under the instructions, under the — that the jury could have considered. It is not — the jury was not specifically instructed on future dangerousness. They were instructed on the question, the single question, having in mind the circumstances of the offense, and they were instructed on other matters such as the evidence they could consider. But there was not a, this is future dangerousness, this is what it means type of thing. Would you not think that a jury deciding a death penalty case like this would be concerned about the nature of the individual and how he would comport himself in the future? That's often a major factor. In some states, it's the most important factor. And the jury could consider that, but they're not required to. No, but they could. That would be a valid factor, and it is a valid factor. I'm not sure I understand Your Honor's question any more than that. Is it the same statute we consider in Campbell? Yes, it is, Your Honor. The statute has not changed in any material facts. There have been additional aggravations. Are we bound by what's on this issue by Campbell? Campbell considered the question of mitigating circumstances. Yes, Your Honor. Did it consider this issue about the inconsistency between the question and the evidence? This Court held in Campbell that the Washington statute has numerous factors which narrow the jury's discretion. No question. Right. That's not this issue. I would submit this issue, Your Honor. The issue is, was the jury ñ was there a narrowing of the eligibility of the defendants who could receive the death penalty? Finally, there was. But we're now at the selection phase. We're not at the eligibility phase. And the Supreme Court has said that there is ñ the Constitution does not place a requirement. And that is the question. The question is whether our prior case law decided this precise issue. And I guess it depends on how narrow you determine this precise issue. I do not recall if the Campbell case dealt with future dangers. It dealt with the selection phase as opposed to the eligibility phase. I believe it did deal with both phases. And, again, the issue of future dangerousness is not before this Court. The only issue challenged was the omission of the prior conviction evidence. All right. Well, let's ñ we've taken you away from what you were applying. So let's go to your next issue. Thank you, Your Honor. Addressing the jury exclusion ñ or the juror exclusion issue, the ñ it is a question of fact under Rainwright v. Witt, and the state court determination of this finding of fact is binding on this Court. Under this Court's ñ No, wait a minute. It's not binding. It's an objectively unreasonable determination. Your Honor, they have not satisfied that prong. Under Taylor v. Maddox and further explained in Lambert v. Blodgett, they have to show that the ñ they have to raise an intrinsic challenge to the fact-finding process. And they have not done that. They have not shown ñ Well, here you have ñ let's take Mr. Deal because I actually find his exclusion the most troublesome. He said he was in favor of the death penalty. He said early on that ñ first of all, I don't know ñ is the questionnaire in the record? I believe it is, Your Honor. It would be in the code. I haven't seen it. So I don't know what question was asked with regard to the death penalty. But it's said in the colloquy that he was ñ he said he's in favor of the death penalty if it's proved by under shadow of a doubt if a person is killed or killed again. I don't know whether he meant ñ whether it means only in that instance or whether that's an example. So I can't tell you what the questionnaire said. And then there's a colloquy in which they explain reasonable doubt to him. He says, oh, that's fine. I'll do that. And then they say to him, and not only that, there's not going to be ñ he can't be released. And he says essentially, well, I need to think about that. And then as far as one could tell, he thinks about it because then they ask him, could you consider it? Yes, sir. And could you impose it? I could if it was appropriate. What's even the ambiguity here at that point? The ambiguity is that, and again, in looking at it, this Court cannot look at just the words spoken. The Supreme Court in Peyton ñ Well, then we can't review it at all. Then we can never review any case. I'm sorry? Then we can never review any case. No, but what I'm saying is that the trial judge had the opportunity not only to do ñ But that's true every time that the juror challenged. So all we can do is review this. We can never review his facial expression. Now, there's nothing in this record that suggests there was anything peculiar about his performance. All we can do is look at this. So this is true any time you review a juror's disqualification. So what is it about Mr. Deal, was the presumptive question, that would ever have prompted the prosecutor to disqualify him? Although the prosecutor gives his explanation. The prosecutor did explain, and the fact is Mr. Deal said he would only impose the death penalty in severe situations, such as where the offender would be released. Well, don't you think a death penalty is intended to be imposed only in severe situations? That is not what the law says, Your Honor. In all situations? No, Your Honor. But the whole point is to pick out among the various situations for which you're eligible the severe ones. That's a fairly low standard. Well, Mr. Deal's explanation of severe situation was where there was proof that the person would be released and would likely kill again. But he backed off that once it was explained, and he said, and is there any case in which a challenge, a Witherspoon challenge has been upheld where the guy says, I believe in the death penalty, as you said, several times? Your Honor, the cases have upheld state court findings where the person says the person's answers and his demeanor and the observations of the trial judge show that the juror cannot follow the court's instructions and oppose the death penalty and it would be proper to under the law. And that is what Mr. Deal said. In a situation where a person is locked up for the rest of his life and there is no chance of his ever getting out again, do you think you could also consider and vote for the death penalty under those circumstances? I could consider it yes. And could you impose that I could if I was convinced that it was the appropriate measure? And he is right. I think in severe situations it is appropriate. And the trial judge, hearing Mr. Deal, seeing him answer, determined that he was substantially impaired. So all you're saying, it seems to me, is you can't tell from the record. Only the trial judge could tell from seeing him, which means you're saying the courts, federal courts cannot review juror disqualifications. No, Your Honor. What I'm saying is they have not raised an intrinsic challenge to the fact-finding process. Therefore, 2254-D does apply. Well, the intrinsic challenge is that there's absolutely no explanation of why it is that this finding was made in the face of somebody who said I believe in the death penalty and several different times I would impose it even though the person isn't going to get out. He said it then. There's another colloquy where he says the same thing again. There's no explanation of that fact-finding at all. How do we know that it was considered? The judge gave no explanation. He actually did answer the other ones. That is not an intrinsic challenge. That is a disagreement with the judge's conclusions. And as the Supreme Court has said in Ringwraith and in Patton v. Jowett. Well, it doesn't tell us that if we know that something important wasn't considered, then that's an intrinsic challenge, right? Now, here we have a sort of black hole because unlike the other two explanations, she didn't give an explanation here. But we certainly don't have any indication that it was considered. And there is no requirement for the judge to give an explanation. Patton v. Jowett, Ringwraith v. Witt said there is no requirement for that. The judge is not even required to say I find the evidence to be biased. That is not an intrinsic challenge. Well, it does say that if you select some of the reasons and don't give a fair picture, the judge picks out isolated parts and relies on them. And in this case, the judge did mention a couple of things without giving a. You might argue without giving an accurate picture of what his testimony was. I don't understand your point that there isn't an intrinsic challenge. You're saying they didn't label this challenge directly. There's no question what they're saying. They're saying looking at these facts, the judge came to the wrong conclusion. That's what they're saying. That's not an intrinsic challenge. No, Your Honor. They're saying the facts do not support. The court read the facts incorrectly. That's a disagreement with the judge's findings. That's not an intrinsic challenge. What's an intrinsic challenge? There was something wrong with the fact-finding process. In other words. The process was it reached the wrong conclusion. That's not an intrinsic challenge to the fact-finding process. That's a challenge to the conclusion, which is I disagree with the judge's conclusion. And if that's the test, then 2254D means nothing. Your Honor, I disagree. It's an unreasonable determination. An unreasonable determination of the facts. And a reasonable jurist looking at this record could reach the conclusion that judge. That's the issue. Okay. The issue is could a reasonable jurist looking at this record reach that conclusion?  You say yes. Yes. Should we take a vote? Okay. Well, that won't be quite enough. So that's what we've been discussing. Okay. Could a reasonable juror looking at these facts say that this juror was impaired under the tests and Wainwright-Adams, whatever the cases are? Okay. What is the argument that he could other than something that we can't see in the record? I mean, in other words, the problem is that so far what you've been telling us is that we really, even though the record seems to say that he could, the judge must have gotten something else that's not in the record. Well, the words of Mr. Deal do show that he was impaired. Where? He says that he would only impose a death penalty. Let's look at lines of the transcript and page so we can all follow what you're saying. Where did you say I will only do something? On excerpts of record 24 to 25 and 28. How about the actual? It's page 190 and 191 of the transcript if you look at the page. Okay. 24 and 25 at the bottom, right? Yes, Your Honor. Then passage from 190 and 191 at the top, right? Yes, Your Honor. If I may step to the desk, I will grab my... Okay, 190. I think we're on the same page. All right. Page 24. We're on the same page here. Okay. Now, what are we talking about? Mr. Deal indicated that... No, no. What are you... Not indicated. What did he say? I'm obtaining my copy of the record, Your Honor. Okay. I'm trying to see it. And unfortunately, I'm not sure if I brought that part with me down from Washington State. All I have is what is in my notes. And the references that I have are to the excerpts of record, page 24 to 25, which are at the bottom, pages 28 to 29. Well, 24 and 25 seems to me to cut directly against what you're saying. He said, I think it would be appropriate in severe cases. It would have to be a severe case. I can't put a real line where that might be. But there are a lot of cases that I don't think it's where people would. So he's not drawing any particular line. He's just saying it has to be a severe case. Is there something wrong with that? Well, Your Honor, you have to look at it as a whole. All right. And reading along with what he said as a whole and giving deference to the judge's observations of when he's speaking. With regard to 24 and 25, since you haven't had a chance to look at it, the thing that helps you there is where he talks about somebody actually wanting to die, if he thought the young man wanted to die. And he gives an example of a situation where he could impose it, where the defendant actually wanted to die. I think that's all you're going to get out of those pages. Yes, Your Honor. But just the reason that's not quite enough is that the only situation what he says is that is one situation where he could do it. It's a good example. A good example. Yes, Your Honor. He does not say it's exclusive. He gives that as an instance, an example. So I think that's all you're going to get out of those pages. I think this time is running short. I think what happens is, if you don't have these things at your fingertips, he had a questionnaire, and in the questionnaire, which we don't have, he seems to have said that it would have to be proven beyond a shallow event. And he gets questioned about that at various points in the voir dire. He gets questioned. Well, specifically, the judge, beyond the shadow of a doubt, is his face. Specifically, at page 42 to 43 of the excerpt, the judge gets back to him about that. He says, I want to. A couple of times, the lawyers do, too. But here's where the judge bores in on these things. The court, in your questionnaire, and that's how we know it's in the questionnaire, it talks about beyond a shadow of a doubt. And the prosecutor here went into it a little further. And the judge says, you know, you realize that the standard is beyond a reasonable doubt. And I think if you're going to get help from this, this is where I'm going to get it. I don't think you're going to get any help. The prosecutor then said, I would not. I would. He challenges him, but not on the term beyond the shadow of a doubt. I think he would certainly stick with the reasonable doubt standard. But then he also explained. The prosecutor said that's not the basis for his objection. Your Honor, Mr. Deal also said he could really only impose the situation where an offender. And then he says entirely inaccurately. And this is the only clue we have for what the judge may have been thinking. I don't think he said anything that overcame this idea of he must kill again before he imposed a death penalty or be in a position to kill again. And he precisely said that that was no longer, that was not true. He said it several times. No, Your Honor, because he said. And that was the prosecutor. Mr. Deal said that he did not know Washington had life without parole. And that changed his opinion as to whether or not. And yes, he did give a quick answer after saying I'd have to give it some thought. He immediately gave an answer. So it's clear he was not giving it the thought. The trial judge could see he was not giving it the thought that was required to answer that question. And the evidence or the lack of an objection is evidence that the witness was biased. And it could be biased. But you think if somebody doesn't know, first of all, it isn't that he didn't know because he did say several times after that he did know. But suppose he had just said, well, with that information, I really can't say what I would do. As I read Adams, that's not sufficient either. It is sufficient when you look at his answers as a whole. You have a lack of objection. And it's not a procedural bar. But it is evidence as to whether he was biased. Can you explain to me why it's evidence as to whether he was biased? Because the Supreme Court has said it. I understand. But yes, it is. And to me, it cuts in favor of the direction that he was not biased. Yes, because obviously what really happened here is that the defense didn't want him on the jury because he kept saying he favored the death penalty. And, Your Honor, the question is not whether he's biased in favor of one person or another. Well, it's certainly relevant to which way we consider it, though. Your Honor, if he's a biased juror, he's not allowed to be. I'm not saying he's biased. I'm saying that the defense made a decision that they did not regard him as biased in their favor. The defense did not object, and that is evidence of bias. And the fact that regardless of which party he's biased for. Did not object to what? The defense did not object to what? The prosecution's request to excuse him for gossip. And we know that because they. They stated and opposing counsel has been kind enough to give me a copy of their excerpts. On page 44, the excerpts of the record, and this is 210 of the transcripts. We have no objection. Well, but it's not clear what they're saying it to. They might simply have no objection to the juror. Your Honor, the judge was asking for counsel's views and the prosecutor goes on and gives this sort of rambling. I hope it wasn't you. The prosecutor says. You weren't the prosecutor. I'm sorry. You were not the prosecutor. No, I was not. Well, OK. It was sort of a rambling response. I don't like this guy. And then Mr. Mulligan, who I gather is the defense lawyer, says we have no objection. Maybe what he was saying is we have no objection to the juror. I would not read it that way. And I think a reasonable jurist could read it as saying we have no objection to his exclusion because the prosecutor. In any event, they don't, in fact, make an objection to exclusion. Whether this is an articulation of non-objection or whether they simply don't take issue with the ruling. Yes, Your Honor. They don't record an objection to the. The trial judge recently concluded it was not an objection to the exclusion. That's what the State Supreme Court said. It was not. They had no objection to the exclusion of this juror. And that's a reasonable. The Supreme Court did not did decide on the merits. It is. There's no procedural. You've got two minutes left. Did you want to discuss another issue? Yes, Your Honor. I will briefly address the ineffective assistance counsel can claim. I want to talk about the lack of a psychiatrist. They thought they needed one because they go to Dr. Brinkley was a guy. Yeah. Well, she was hungry. Dr. Brinkley. And it turns out they got skunked out there. He was batting for the other team. But that indicates to me that they thought they needed a psychiatrist. And then they realized late in the game. My God, we never did. We never did get one. That's a remarkable admission to get in a case like this. Almost any death case. But particularly one with this, say, you know, torture. OK. Yes. I mean, you would think that having a somebody there to to at least a few. I mean, you would think that Dr. Brinkley's conclusions would be would have been useful. You just needed one juror. That's all. To stop the stop the death penalty from being imposed. Counsel made a reasonable decision that when they learned Dr. Brinkley was not available, not to seek a continuance. They would have had they didn't learn until halfway through the penalty for the guilt phase that he was not available. And they decided we will not seek a continuance of the penalty phase because we are more prepared in the state. They've been able to withhold discovery until the beginning. That doesn't make any sense to me. Pick a date, say, December 1, just to pick an arbitrary date. Someone tells them Dr. Brinkley is not available. Dr. A is not available. Now, they could have called Dr. B on that same day. They would have been no further along with Dr. A if he had been available than if they'd called someone else who said I'm available. Why did they need more of a continuance without even making one or two phone calls? I don't know how many psychiatrists there are who are experts in this. Maybe they'd have to ask a couple of questions to say who should we call. But they had to start from the beginning with Dr. Brinkley, and they would have had to start with the beginning with Drs. B or C, whoever it was they called. So why did they know they needed a continuance with B or C where they wouldn't have needed a continuance with Dr. Brinkley? And because time is short, you might as well ask this question. Why was it reasonable for them to wait that long to contact even Dr. Brinkley? What I take away from that situation is that they said, gee, we really need a psychiatrist. And then they do it late. And when their first choice is unavailable, they drop the issue. It takes time to prepare a case and to get witnesses. They decided early on. They began as early as February 1992 to start looking at mental health defenses. The state obviously started earlier, figured out that they needed a psychiatrist. I mean, maybe if they have Dr. Brinkley was so hot and his lawyers were so good, they might have gotten Dr. Brinkley if they had made the call a day earlier or a week earlier or a month earlier. If they had gotten Dr. Brinkley, they would have an unfavorable opinion that the state could have used. You never know when an expert witness is going to say, depending on who hires him. Well, we know from the facts of the case. At the very least, they would have kept Brinkley from testifying for the state. I'm sorry? At the very least, they would have kept Brinkley from testifying for the state. If they had gotten a hold of him and gotten a valuation and gotten a bad and unfavorable variation from him, the state couldn't have forced Brinkley on the stand to deal with that. Your Honor, I would submit under the Pollack case, the state versus Pollack, which the habeas petition was denied by this court, having Dr. Brinkley provide an unfavorable report to the defense could be used by the state. Well, but Dr. Brinkley did not interview Cal Brown. And presumably if he had been hired by them, he would have. So I don't have any idea whether his opinion was very strange because it was essentially the records don't show it. Well, all that shows that people didn't write it down. It doesn't prove much of anything. When do you know when Dr. Mowry, Mowry, when he first told the defense counsel that they should get a psychiatrist? Yes, Your Honor. The district court entered a finding. In fact, this is that excerpt of the record 2470. He made this just a short time prior to the start of trial on November 30, 1993. And then they immediately sent out a letter to Dr. Brinkley asking, seeking to retain him. And they learned approximately sometime between December 3rd and December 6th that he had already been retained by the state. And that was halfway through the guilt phase. Now, there seems to be a. Feeling in the impression from the transcript that the lawyers initially felt that they had to make a choice between getting a psychologist and a psychiatrist. Why did they have to make a choice? Why couldn't they get a psychiatrist as well as a psychologist? They made the choice that they would rather go with a psychologist first because of the testing that would provide greater information for the defense to use. And there is no Supreme Court case that says they had to get a psychiatrist at the same time. And their actions were reasonable. They know what there's no case to get at the same time. But if you have to get it, you're saying they could get it after the psychologist. And that is then you would ask for a continuance. And they decided to give you enough time and they decided not to ask for continuance. And they had reasons for doing so. Where in the record is this continuance issue? The suggestion that it was because it was over Christmas or because they were trying to get the sort of jammed the prosecution. Did anybody say either of those things? Yes, Your Honor. It's in the testimony at the evidentiary hearing. Excerpts of record 1919. There was a discussion between counsel and counsel. And I believe Mr. Clevin, who was the second defense counsel, indicated that they had withheld discovery. Withheld having to give information to the state until the start of the penalty phase. And actually, the state didn't get all the information until Dr. Meierl testified. And they decided we're in a better position because of that. The state is going to have less time to prepare. Let's not ask for continuance. Christmas is not in the record. That is the second reason. They also wanted to get the case to the jury over the Christmas holiday because they hoped the jury would be more merciful at that time. I see. Yes, it is earlier. I see it. I'm way over my time, but if I can briefly conclude, even if they had called a psychiatrist, and even if the jury believed that he had bipolar disorder and could use lithium, it would not have made a difference. Brown committed this crime for one reason. And Dr. Scherr admitted bipolar does not cause you to commit violent crimes. But it might have made a difference on the sentence. It may or may not have made a difference on the conviction. But on the sentence, the witness testimony was pretty weak. He never examined Brown. He spent, I forget the number of hours, but was it like six hours, preparing, examining files. And it seems to me that a psychiatrist who actually talked to the defendant could easily have neutralized the effect of Blinter's testimony and could well have effected one juror in deciding whether to vote for the death penalty. Dr. Brinkley spent 12 hours, Your Honor, but if he had talked to Mr. Brown, Mr. Brown would have said, I did this to Holly because it was a game. In his own words to Dr. Scherr, this was hanky spanky games. I tortured her because I enjoyed it. It was a game. It would not have effected the jury's verdict. They would have sentenced him to death. Justice had it done in this case, and the district court correctly denied relief. I'm sorry, but whether or not it would have effected Brinkley's testimony wasn't the point. The point was he did not, in fact not, he testified without having actually examined the defendant. And what I'm suggesting is, given that reality, bringing in an expert who has examined the defendant and who takes statements like that and says, you know, the guy is really loony. I mean, nobody thinks that torturing people, nobody is saying things that torturing people is fun and games. I mean, you can split it lots of ways. A psychiatrist, and I've talked to the guy. I've actually sat there and talked to the guy, and let me tell you, this guy is totally nuts and really ought not to be held responsible for much of what he did. I mean, possibly could not, probably likely would not have effected the conviction. I mean, I feel fairly comfortable in saying that, but I'm less comfortable in saying it wouldn't have effected even a single juror in deciding whether or not to send this guy to his death. Dr. Scherer did talk to Mr. Brown, and Dr. Scherer said, on cross-examination at the evidentiary hearing, he knew what he was doing, he knew right from wrong, he intended to do what he did, and he did it because he enjoyed it. She admitted on cross-examination, the very first, or the very last thing she said, that he could control his behavior. If a police officer had been sitting in the car with her, he can control his behavior enough not to choose her as the victim. Dr. Scherer thought it would be less likely, if he was on lithium, that he would have committed these crimes. She had no support for that opinion. It was pure speculation. There was no test to support that, no studies to support that, no literature supported that, and she could not say how less likely, whether it was 1%, 5%. She couldn't say. What she did say was that it was sexual status that caused it. This is the psychologist, right? No, the psychiatrist that they called, that Mr. Brown called at the evidentiary hearing. This is what she would have admitted to on cross-examination, if she had testified at trial. She would have also testified that in 1993, she had no blood tests to support her opinion that lithium was required. She admitted that screen tests are necessary to determine if lithium... But you can't take a blood test to see whether you should take lithium. No, Your Honor. Both Dr. Brinkley and Dr. Scherer, the petitioner and psychiatrist, admitted that you take the blood test to see if they're within the therapeutic range. If the lithium is within the therapeutic range and the behavior improves... Yes, if he's taking the lithium, but only if he's taking lithium. And also to see if it's working. Right, to see if it's working, if he's taking it, but not to see if he should take it. No, Your Honor. It's to see if he should take it. Both Dr. Brinkley and Dr. Scherer... Well, that's not my understanding of the record. They were giving him lithium for a while. There was a diagnosis that he needed lithium. And it went on for a number of months. So why would she have needed a blood test? Because both psychiatrists admit that those blood tests are necessary. In the vast... But it wasn't necessary when they gave it to him in the Oregon prison? They were doing it unnecessarily? In 1993, the vast majority of psychiatrists disagreed that he had bipolar disorder and disagreed that lithium was appropriate. Looking at the trial... Oh, that certainly isn't true. I'm sorry, Your Honor? That's just not true. But it was true at the time of the trial, and that's what this court must... I didn't see any evidence that psychiatrists thought that it wasn't appropriate for bipolar disorder. I thought that he said he didn't have bipolar disorder, not that lithium wasn't appropriate if he had bipolar disorder. Dr. Engel, and this is at supplemental excerpts of record 134 to 136, in a defense investigation report says that he did not see any disorder that would require lithium. That's a different question. That's what I said, that he said there was no such disorder, which is why he shouldn't have lithium, not that if he had a bipolar disorder he shouldn't have that lithium wouldn't help. But in 1993, the vast majority... Where is that in the record? Dr. Schur admitted it, and Sally Schick admitted it in their cross-examination at the evidentiary hearing. Dr. Schur admitted it at excerpts of record 1850 to 1851. Or, I'm sorry, 1856, to page 1856 of the excerpts of record, that the vast majority of psychiatrists had diagnosed Brown with antisocial personality disorder and not bipolar disorder. And Sally Schick... Say that again? Dr. Schur admitted that the vast majority of psychiatrists and psychologists had diagnosed Brown with antisocial personality disorder. That's a different... You're shifting around in such a way that I'm having a hard time following you. I thought you said several times that the vast majority of psychiatrists at that time would have said that lithium was not appropriate for bipolar disorder. Did you not say that? No, Your Honor. You did say it several times. That's what I understood. I'm sorry, I misspoke. What I said was they said Brown did not have bipolar and did not see... The vast majority of psychiatrists... How many psychiatrists examined him? There had been numerous treating professionals that had examined him, both in California and Oregon. There was extensive prison records and medical or mental health records that were submitted to the defense. Okay. All right. Is that it? I believe that is. I appreciate... I will just scratch the surface of the issues. Thank you very much. Thank you. A couple I have to know. You do? There isn't anything in the Washington statute that talks specifically about future dangerisms. I thought there was. My recollection was that the statute said specifically future dangerism. The statute, right. 10.950708. Whether there is a likelihood that the defendant will pose a danger to others in the future. I stand corrected. There was no instruction given to the jury in this case about future dangerisms. I'm having a hard time understanding your theory on the statute. You start out by saying we are not saying that there should have been an instruction given. And then you seem to say but there should have been an instruction given. I'm really... What exactly is your theory? Well, my theory on the statute is that after the Bartholomew case, the statute is unconstitutional on its face because it allows the jury, allows the prosecution in its opening portion of the penalty case to introduce evidence of criminal activity, which is not tied in any way to the question that's posed to the jury. But presumably it could be tied by giving an instruction. So the problem is an instructional problem eventually. Isn't it? Well, except that the statute says that the question that the jury is to be asked is having in mind the crime, are you convinced beyond a reasonable doubt that there are no sufficient circumstances to merit leniency? And the issue of future dangerousness is not pegged to that question, nor is the criminal conduct, other criminal conduct evidence, which may come in regardless of whether or not it's admissible under 404B, that's also not pegged to that question. Isn't part of the problem here that the burden is on the prosecution? And the prosecution has to prove a negative beyond a reasonable doubt. They have to prove beyond a reasonable doubt that there were not sufficient mitigating circumstances. Is that accurate so far? Right. So maybe they do have to introduce, one factor is whether the defendant has or does not have a significant history of prior criminal activity. So maybe if they prove that he does, they have negated the mitigation factor that he does not. In other words, they've now eliminated the possibility that you could come in either directly or by implication and say that he's never done anything in the past, and therefore there's a mitigation factor. But the problem is that the evidence comes in regardless of whether the defense presents a mitigation factor. But maybe that's because the burden is on the prosecution to prove a negative. In other words, the burden is on them to prove that there are not mitigation circumstances. It's a very strange structure, but that seems to be the structure. But again, I think the problem as I see it is that there's evidence that comes in regardless of whether or not the defense presents mitigation evidence, and the jury's not told what to do with it. And this is considered by the Washington Supreme Court to be non-statutory aggravation. But it's statutory. That's the really funny thing, because there is a list in the statute, but the jury hasn't given it for some reason. I mean, they keep saying things that are in the statute are non-statutory. The court in Bartholomew called the evidence non-statutory. Well, they were wrong. That's all. It's statutory. It's just the way you were wrong when you said it's not in the statute. It's there in the statute. So it can't be non-statutory. All right. Anything else? The statute also doesn't say that the jury's supposed to be instructed about this. They just read this 0.070 to the jury. The statute would look an awful lot like the California statute or many other statutes, and it wouldn't be confusing at all. What I find confusing is that this wasn't read to the jury. So they were just given a question and absolutely no idea of why any of these things were pertinent. You did, in fact, give them two possible mitigating factors, the mental health ones, but nothing else. In this case, it was mental health, and then the secondary mitigating factor was the family background. The what? Family background. That was read to them. I thought what was read to them was... The only instructions that they were given on statutory mitigating factors in this case were instructions concerning the mental health issue and ability to conform one's conduct to the requirements of law, which Dr. Scheer's psychiatrist testimony would have gone to, which I maintain, since it went to that and not future dangerousness, which they were not instructed on, it would not have opened the door to the admission of additional unpleasant evidence about future dangerousness. I just want to talk about the Campbell case briefly. That's different because in Campbell, the issue is whether or not the statute was vague and allowed for standardless discretion in a different way. And the appellant in that case had argued that the Washington Supreme Court's effort to cure that problem in Bartholomew was improper because you couldn't cure that type of problem by judicial construction. And that's a much different issue than the vagueness and discretionlessness issue that we've presented in this case. What was the different way? Well, in the language that was argued to be objectionable in Campbell was the language that the jury could consider any other relevant factors. And the appellant in that case argued that that portion of the statute was vague, which is a different portion of the statute than the one that we're talking about here. I'd like to just go back to the ineffective assistance of issue and talking about the point in time when the defense was put on notice and the point in time when the bells and whistles went off and they should have done something. In this case, months before trial, they had possession of a record from Oregon saying that this guy has a bipolar disorder or a mood disorder and that efforts were made to treat him with lithium. And they also knew from other records that following his release from Oregon State Prison, they felt there was an adequate follow-up on those treatment recommendations. I maintain, again, that months before trial, because of the information that they had at that time, they should have known at that point that they needed to get a psychiatrist on board. So essentially by failing to act when they were put on reasonable notice, they left themselves vulnerable to be in the position that they were in at the time of trial where they had to choose between asking for a continuance and seeking to get a psychiatrist. And since, of course, at the time of trial they made no effort to get a psychiatrist, we don't know whether or not that effort should be made. But they actually, I mean, what's disturbing about this case is that in some ways these lawyers were astonishingly energetic in terms of what they did. And they seem to have made a decision on the psychological testimony to do it in a certain order. They first consulted somebody who they hoped would come up with an organic problem, because I guess they thought that solved better with a jury. And that didn't work because they didn't come up with it. So then they went to Dr. Morrow. They knew about the lithium problem. They went to him first, I guess, because they thought he could do a broader study. And then they got caught up against time, and I think against money, too. How does that tie? I mean, whose problem is that? There seems to be some sense that there was a money problem. Well, there's none. They testified in the federal court evidentiary hearing that the money problem did not prevent them from getting a psychiatrist. And the other thing is that we don't know about that because they never made the effort to get funding, and then the funding was denied. And then the other thing that's curious about that is that the state argued in state post-conviction, when I raised the AT issue, that there was plenty of money available for Mr. Brown. And the one reason why I didn't raise the AT issue in this proceeding is I just didn't think there was evidence to support it. So what really happened is they kind of guessed wrong in terms of what was going to pan out. And then they ran up against the deadline. So the question is if they moved everything back, presumably they could have gotten it all in. In the federal evidentiary hearing, there was a social worker who worked for the defense by the name of William Shipp. And he testified that before the trial, long before the trial, he had discussions with the defense team. And it was pointed out in those discussions that you need a psychiatrist to talk about lithium, that you can't simply rely on the testimony of a clinical psychologist. So they guessed wrong. It was an uninformed guess. They were on notice that they needed to be formed and ignored the notice. And I think the technical inability is, and I'd like to conclude with that, is simply that you can't ignore the obvious in making your investigation in a capital case. And that's precisely what happened here. The other thing in terms of the facts of the case, which counsel went into, I think there's part of the explanation of the egregiousness of the facts is the exaggerated behavior and the hyperactivity, which is consistent with the mood disorder, which is something that Dr. Scheer or a psychiatrist, had they been called, could have explained. Thank you. Let me ask you this. When they got the letter from Dr. Brinkley, say, December 1st, whatever date they got it, and he said, I could not be, I can't be your witness. They would have had to start, if the letter had been yes, I can be. They would have had to start preparing him for the trial immediately. Why would they have needed needed a continuance if they had called some other doctor in the next day or two and found out he was available? What was different if Dr. Brinkley had told him they would be available? I mean, why is it necessary to get a continuance if they didn't need a continuance? Had Dr. Brinkley said he could do it? Well, there's no indication that they would have needed a continuance. Well, but everybody's here to talk about whether they wanted a continuance, and it was a tactical decision not to get a continuance. But what evidence is there that a continuance would have been necessary? There is none. There is none. I mean, there's every indication. They had a couple of weeks between the time that they knew that Dr. Brinkley wasn't available and the time that the penalty phase began that they could have. Well, that either is enough for Dr. Brinkley. If it was enough for Dr. Brinkley. Then why wouldn't it have been enough for somebody else? It would have been. It would have been. And we don't know because they never made the effort. And that's why the failure, the continuance issue is kind of a red herring to me because it's based upon inadequate information. They're saying we have to pick between a continuance and getting a psychiatrist, but they didn't know at that point whether they would have been able to get a psychiatrist or not. And so, therefore, they're making a tactical decision, which is essentially uninformed. Do you agree they did make that tactical decision? No, I don't think they made any decision. I mean, that's what they said. We don't know why we did what we did. Thank you. Thank you. All right. Thank you both very much. Thank all of you very much. Case disargued will be submitted. We'll stand in recess for the day.
judges: Reinhardt, Kozinski, Berzon